FOURTH DIVISION

March 11, 2004

Nos. 1-02-3605, 1-03-0068 consolidated.

GLOBALCOM, INC., ) 

) 

Petitioner, )

)

)

)

ILLINOIS COMMERCE COMMISSION and )

ILLINOIS BELL TELEPHONE COMPANY, INC., )

) Petitions for Review of 

Respondents. ) the Orders of the Illinois

) Commerce Commission in

) Ill. C.C. Docket No. 02-0365.

)

ILLINOIS BELL TELEPHONE COMPANY, INC., )

)

Petitioner, )

)

)

)

ILLINOIS COMMERCE COMMISSION and )

GLOBALCOM, INC., )

)

Respondents. )

JUSTICE GREIMAN delivered the opinion of the court:

Globalcom brought this action against Illinois Bell Telephone Company, d/b/a Ameritech Illinois, now known as SBC Illinois (SBC) before the Illinois Commerce Commission (ICC or Commission).  Globalcom alleged that SBC was knowingly engaging in anticompetitive conduct intended to unlawfully restrict competition in the telecommunications market in Illinois.  Globalcom's prayer for relief sought injunctive relief, actual damages, attorney fees, and costs.  The Commission issued what essentially amounted to a "split decision": it dismissed Globalcom's claims based upon SBC's federal tariff for a lack of jurisdiction, and ruled in favor of Globalcom on only two of its claims based upon an Illinois tariff.  SBC has appealed the issues it lost on the merits while Globalcom appeals only in pursuit of greater damages and more attorney fees on the two issues where it prevailed.

Essentially, this case boils down to an examination of whether SBC knowingly engaged in conduct that was anticompetitive to a rival telecommunications competitor.  Specifically, two aspects of SBC's conduct fall under this scrutiny: (1) charging early termination fees to Globalcom due to Globalcom's premature cancellation of a contract with SBC for certain services; and (2) requiring Globalcom to pay rent to store its equipment in an SBC facility as a condition of obtaining a new service from SBC.  We conclude that the evidence does not support a finding of liability based upon the imposition of early termination fees.  However, we also find the evidence does support a finding of liability for the "rental" requirement SBC imposed upon Globalcom.  Accordingly, we reverse in part, affirm in part, and remand the cause to the ICC for a proper redetermination of attorney fees and other incurred costs.

In May of 2000, Globalcom initiated a fast-track proceeding against SBC pursuant to section 13-514 of the Public Utilities Act (Act) (220 ILCS 5/13-514 (West 2002)).  Globalcom claimed that the terms upon which SBC offered a certain combination of unbundled network elements (UNEs), known as an "Enhanced Extended Link" (EELs), were anticompetitive in violation of section 13-514 of the Act.  The Commission rejected many of Globalcom's claims, but agreed with Globalcom in two respects.

SBC's obligation to provide UNEs to competing local exchange carriers (CLECs) arose from the federal Telecommunications Act of 1996 (FCA) (47 U.S.C. §332(c)(7) (2000)).  The FCA sought to introduce competition in the local communications market by dismantling "natural monopoly" regulation and creating ways by which CLECs can compete with "incumbent" local exchange carriers like SBC.  In short, a CLEC can lease certain "network elements" from the incumbent on an unbundled basis and use them, either in combination with other UNEs or with its own facilities, to provide competitive telephone service.

The Federal Communications Commission (FCC) has identified the list of network elements that incumbent carriers must unbundle and has issued rules regarding the incumbent's duty to provide combinations of UNE's.  Specifically, the FCC required incumbents not to separate combinations of UNEs that are already connected to one another (preexisting combinations) and to affirmatively combine UNEs for CLECs in some circumstances (new combinations).  Two of the units defined by the FCC are the "local loop," a wire which connects a home or business to the incumbent's switch, and dedicated interoffice transport facilities (dedicated transport), which connect various switches to one another.  Together, a loop and a dedicated transport facility constitute an EEL.  This case involves the terms and conditions on which SBC offered both pre-existing EELs and new EELs.

In the past, Globalcom leased "special access service" from SBC to connect Globalcom's customers to the network because SBC did not have a tariff to make EELs available.  Special access is a dedicated transmission path between two points located within a single state (
i.e.
, between SBC's local exchange network and another carrier, or between an end user location and a carrier's local exchange network).  Special access is an SBC retail-based offering with retail-based rates.  Consequently, rates associated with special access are much greater than the rate of cost-based UNE combination EELs.  Under rules promulgated by the FCC, a special access circuit is classified as "interstate" and governed by SBC's federal tariff if more than 10% of the traffic that travels on that circuit is interstate.  Conversely, if less than 10% of the traffic on a circuit is interstate, a carrier may certify that it is intrastate and purchase the circuit under a corresponding Illinois tariff.  Globalcom purchased the vast majority of its special access circuits from SBC under the federal special access tariff.

Both the state and federal tariffs in effect at the time of the Commission's decision provide for an optional payment plan under which a customer can agree to lease special access service for a specified period of time at a discount, rather than on a month-to month basis.  Each tariff further provides that "customers requesting termination of service prior to the expiration date of the [optional payment plan] term will be liable for a termination charge."  "The termination Charge *** will be calculated as follows: The dollar difference between the current [optional payment plan] rate for the [optional payment plan] term that could have been completed during the term that the service was actually in service, or the monthly rate for services in place less than 12 months, and the customer's current [optional payment plan] rate for each month the service was provided."  In other words, if a carrier commits to a certain term of service and then terminates its service before the term is expired, it must pay the difference between the amount that it would have paid if it had correctly stated its term of service and the lesser amount that carrier paid prior to termination.

According to FCC rules, under the FCA, a CLEC may terminate its lease of a special access circuit from SBC and ask SBC to provide that circuit as an EEL. CLECs can do this if, among other things, they certify that they will use those facilities to provide a significant amount of local exchange service to an end user, and thus compete with SBC.  As mentioned above, replacing a special access circuit with an EEL is attractive to CLECs because the FCC's pricing rules for UNE's make an EEL far cheaper than a special access circuit.  In Illinois, on June 30, 2001, section 13-801 of the Act (220 ILCS 5/13-801 (West 2000)) became law and obligated SBC to make UNEs, including EELs, available to CLECs.  

In December of 2001, Globalcom asked SBC to terminate its lease of five special access circuits under the federal tariff and to obtain access to the same facilities as EELs.  SBC denied the request because the EELs would have been "commingled" with tariffed special access services, in violation of FCC rules.  SBC also stated that the termination of the special access circuit prior to the expiration of the optional payment plan term for which Globalcom committed itself would trigger payment of the termination charges under the federal tariff.  Globalcom did not challenge SBC's position on "commingling," but also did not want to pay the termination charges.  Consequently, Globalcom chose not to pursue the conversion of those circuits. 

On March 14, 2002, Globalcom sent SBC a notice of an alleged violation of section 13-514 of the Act, and then filed its first amended complaint with the ICC on May 16, 2002. Globalcom asserted that the termination charges did not apply under the federal tariff or the Illinois tariff in instances where Globalcom "converted" its purchase of special access and simultaneously obtained access to the same facilities as UNEs for the remaining term.  

The Commission rejected Globalcom's assertions with respect to the "conversion" of the federal special access circuits to UNEs.  The ICC's order found that SBC's enforcement of the termination liability provision is "not in derogation of federal law and FCC regulations, and the Commission has no authority to direct SBC Illinois to depart from the terms of federal tariffs."  In other words, "FCC tariffs pertain to interstate, not local, telecommunications services and exist exclusively under federal authority."  Nevertheless, the ICC held that the termination liability of the Illinois tariff would not apply for the "conversion" of special access circuits to EELs.  In so finding, the ICC held that SBC acted "unreasonably" and "knowingly impede[d] the development of competition" by assessing early termination charges under the Illinois tariff.

As noted, section 13-801 of the Act also required incumbents to make new EELs available to CLECs by combining a loop and a dedicated transport facility that were not already connected.  New EELs offer the same discount as preexisting EELs, but also reduce the number of the incumbent's central offices at which the CLEC must install, or "collocate," its own equipment.  As the FCC explained, a new EEL:

"[A]llows a requesting carrier to serve a customer by extending a customer's loop from the end office serving that customer to a different end office in which the competitor is already collocated.  The [new] EEL therefore allows requesting carriers to aggregate loops at fewer collocation locations and increases their efficiencies by transporting aggregate loops over efficient-high capacity facilities to their central switching location.  Thus, the costs of collocation can be diminished through the use of the [new] EEL *** [because a CLEC] would need to collocate in as few as one incumbent *** central office *** to provide service."  
Third Report and Order and Fourth Further Notice of Proposed Rulemaking, 
Implementation of the Local Competitive Provisions of the Telecommunications Act of 1996
, 15 F.C.C.R. 3696, par. 288 (1999) (
UNE Remand Order
).

Specifically, section 13-801(d)(3) of the Act directed SBC to provide CLECs with certain UNE combinations from a draft of an interconnection agreement that SBC previously had submitted in another ICC proceeding, identified as "Draft I2A."  New EELs were part of the new UNE combinations in the Draft I2A, and the Draft I2A required that a new EEL terminate in a CLEC's collocation arrangement in an incumbent's central office. 

As SBC notes, however, Act section 13-801 was not self-effectuating.  Instead, there needed to be some instrument setting forth the specific rates, terms, and conditions on which SBC would offer its various products and services.  Accordingly, SBC filed a "compliance tariff" with the ICC on July 2, 2001, the first business day after Act section 13-801 took effect (the permanent tariff).  Consistent with Act section 13-801(d)(3), the permanent tariff's provisions on new UNE combinations used the terms and conditions for those combinations in the Draft 12A, including the collocation requirement for new EELs.  After allowing over two months for the ICC to review the tariff, the ICC entered an order on September 13, 2001, that suspended the permanent tariff and initiated a docket to review it.

Thereafter, on September 10, 2001, SBC voluntarily filed its "interim compliance tariff" in accordance with section 13-801 of the Act, pending review of its proposed permanent tariff by the Commission.  According to SBC, the express purpose of the interim compliance tariff was to "immediately" make all of the new UNE combinations in the Draft 12A available to all CLECs on the same rates, terms, and conditions (including the collocation requirement) set forth in the Draft 12A and in the proposed permanent tariff.  Because SBC ostensibly wanted to make the new UNE combinations available to CLECs as quickly as possible, it asked the ICC to have the interim tariff take effect on less than the usual 45 days' notice.  The ICC staff, who had already reviewed the identical terms and conditions in the permanent tariff for two months, "reviewed the tariff again" and found "good cause" for granting SBC's request.  The interim tariff took effect on September 18, 2001.

Less than two weeks prior to its seeking to convert its special access facilities to existing EELs, Globalcom also sought the lease of new EELs.  However, SBC did not fill Globalcom's order because Globalcom did not have a collocation arrangement in place and, therefore, was not able to purchase new EELs under the interim tariff.  Globalcom also challenged this denial in its complaint to the ICC, claiming that the requirement that new EELs terminate in a collocation arrangement was unlawful and anticompetitive under Act section 13-514.  

However, before the ICC could rule on that complaint, it decided in the permanent tariff investigation that requiring new EELs to terminate in a collocation space violated Act section13-801(d)(3).  Globalcom then admitted that decision removed any need for relief in its own complaint case, and the ICC concurred, stating that it "need not resolve" Globalcom's complaint regarding the collocation requirement for new EELs.  However, the ICC then ordered SBC to pay damages to Globalcom for having included the collocation requirement in the interim tariff.  Specifically, the ICC held that SBC "should have known" that the collocation requirement was unlawful.  It concluded: "It should have been apparent to [SBC] in September, 2001, when it filed the Interim Compliance Tariff, that the applicable authorities were not merely devoid of a collocation requirement, but expressly negated it."

In so holding, the ICC found that SBC must pay damages caused by SBC's collocation requirements to Globalcom for the difference between what Globalcom paid for special access circuits under SBC's valid state tariff and what it would have paid for new EELs had they been available without collocation.  However, the Commission limited its damages calculations to only those services ordered from SBC's intrastate special access tariff because it reasoned that it did not have the authority to award damages based on purported violations of federal law.  After having ruled on the merits, the Commission then considered the provisions in the Act that authorized it to impose penalties, award attorney fees, and to allocate the Commission's costs of the proceeding among the parties.  See 220 ILCS 5/13-515(g), 5/13-516(a)(2), (a)(3) (West 2002).  The Commission (i) declined to impose penalties; (ii) awarded Globalcom 50% of its attorney fees; and (iii) ordered Globalcom to pay 25% of the Commission's cost of conducting the proceeding.  Both SBC and Globalcom have appealed.

The issues in this case involve the Commission's interpretation and application of provisions of the Act as well as SBC's tariffs.  The Commission's interpretation of a provision of the Act "should only be reversed if it is erroneous."  
Illinois Bell Telephone Co. v. Illinois Commerce Comm'n
, 282 Ill. App. 3d 672, 676 (1996).  Moreover, a tariff is a statute, not a contract, and has the force and effect of a statute.  
Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.
, 67 Ill. App. 3d 435, 439 (1978), citing 
City Messenger Service of Hollywood, Inc. v. Capitol Records Distributing Corp.
, 446 F.2d 6 (6th Cir. 1971).  Accordingly, when interpreting the applicability of a tariff, "[i]f the Commission's interpretation is not an unreasonable one," the reviewing court will not reverse it.  
Chicago Housing Authority v. Illinois Commerce Comm'n
, 20 Ill. 2d 37, 42 (1960); 
General Mills, Inc. v. Illinois Commerce Comm'n
, 201 Ill. App. 3d 715, 721 (1990). 

However, when reviewing the Commission's factual findings, this court must determine whether they are supported by the evidence, not whether based on that evidence this court would have arrived at the same conclusion as the Commission.  
Champaign County Telephone Co. v. Illinois Commerce Comm'n
, 37 Ill. 2d 312, 320-21 (1967).  In other words, the petitioner bears the burden of proof to show that the opposite conclusion is clearly evident.  
Citizens Utility Board v. Illinois Commerce Comm'n
, 291 Ill. App. 3d 300, 304 (1997).  Nevertheless, when the Commission drastically departs from past practice, the Commission's decisions are entitled to less deference.  
Business & Professional People for the Public Interest v. Illinois Commerce Comm'n
, 136 Ill. 2d 192, 228 (1989).

SBC's first argument on appeal is that the Commission erred in finding that its early termination charges did not apply under the Illinois special access tariff for five separate reasons.  First, SBC notes that the Illinois special access tariff contained exactly the same language governing termination charges as its federal counterpart which permits the assessment of termination charges in the same circumstances.  Further, SBC notes, the Commission previously has upheld the assessment of early termination charges under the Illinois tariff as well.  And because the Commission construes the same language in the federal and state tariffs with different results, SBC asserts its holding is arbitrary and capricious.

At the outset, SBC claims that there can be no doubt that the FCC has upheld the assessment of early termination charges under federal special access tariffs whenever the purchaser terminates the special access service and leases an EEL.  It offers the following examples:

"We note, however, that any substitution of unbundled network elements for special access would require the requesting carrier to pay any appropriate termination penalties required under volume or term contracts."  
UNE Remand Order
, par. 481 n. 985.

"We reject comments by US LEC/XO that *** early termination penalties *** are obstacles to their ability to convert special access circuits to EELs."  
Joint Application by BellSouth Corp.
, 17 F.C.C.R. 9018, par. 200 (2002).

"[O]ur current rules do not require incumbent LECs to waive tariffed termination fees for carriers requesting special access circuit conversion."  
Application of Verizon Pennsylvania, Inc.
, 16 F.C.C.R. 17419, par.75 (2001).

"We reject AT&T's proposed language and decline to override the termination penalties contained in Verizon's special access tariff.  AT&T voluntarily purchased special access services pursuant to Verizon's tariff and took advantage of discount pricing plans that offered lower rates in return for a longer term commitment.  We will not nullify these contractual arrangements that AT&T previously accepted."  
Petition of Worldcom, Inc.
, 17 F.C.C.R. 27039, par. 348 (2002). And

Joint Application by BellSouth Corp., 
et al.
, 17 F.C.C.R. 17595, par. 212 (2002) (stating that "early termination penalties" are not an obstacle to a CLEC's "ability to convert special access circuits to EELs" and do not violate FCC rules).

Moreover, in a prior case, SBC argues that the ICC itself followed the FCC's lead and upheld the assessment of termination charges under the Illinois tariff.  See 
Level 3 Communications, Inc.
, Ill. Com. Comm'n No. 00-0332 (August 30, 2000).

Alternative to that argument, SBC asserts that even if the ICC's interpretation were correct in this case, there is still no lawful basis for its finding that SBC violated Act section 13-514.  As the Commission previously has noted, a simple allegation that the conduct is a prohibited action is not sufficient to support a finding of an Act section 13-514 violation.  Rather, the complainant has the burden of proving that "the particular transgression was unreasonable in light of all the relevant surrounding circumstances."  
21st Century Telecom of Illinois, Inc.
, Ill. Com. Comm'n No. 00-0219, at 24 (June 15, 2000).  In the present case, the transgression that is alleged to have occurred is SBC's assertion that a "conversion" of special access services to UNEs prior to the expiration of the optional payment plan term under which service was purchased constitutes a "termination of service prior to the expiration of the [optional payment plan] term," thereby triggering liability for termination charges under the terms of the Illinois tariff.

However, SBC notes, the order makes no finding that SBC knowingly sought to impede competition or acted unreasonably in maintaining or defending its position, as Act section 13-514 requires.  Nor could it, SBC asserts, where the FCC and the ICC previously have endorsed and upheld that very position.  Accordingly, SBC concludes that the Commission's determination that SBC be held legally "culpable" under Act section 13-514 is tantamount to finding SBC liable 
ex post facto
 for failing to predict the Commission's change in policy, as announced for the first time in the underlying order.

Second, SBC argues that the Commission's order is founded on a misconception of the nature and purpose of the termination charge.  It claims that because the ICC saw that the early termination charge represented compensation for lost revenue after the termination date, it found that it should not apply when the terminating carrier purchases an EEL for the remaining term.  In particular, the ICC held: "The continuing revenue stream also insulates the provider against additional economic loss" and "the forward looking cost of service is accounted for through the TELRIC cost determination methodology" applicable to the pricing of UNE's.  SBC asserts that the ICC's determination that the termination charge was "forward looking" led it to conclude that the charge does "not appropriately address the continuing purchase of the same facilities for the balance of the term commitment," regardless of what form those facilities take.

Rather, SBC argues, the termination charge is intended to "true-up" revenues received 
before
 the termination date, 
i.e.
, to correct for the fact that those revenues reflected a discount to which the customer, by virtue of its early termination, was not entitled.  To illustrate, SBC offers the following analogy: Assume carrier "A" purchases a special access circuit under an optional payment plan and commits to a five-year term.  During that term, carrier A would pay a lower rate than another carrier ("B") that leases an identical circuit for a shorter term commitment (say, two years).  If, however, carrier A terminates its circuit after two years, it must pay a termination charge, calculated as the difference between the amount that carrier A paid prior to termination (two years at the lower five-year rate) and the higher amount that it would have paid if it correctly stated its term up front (two years at the higher, two year rate).  

Thus, SBC asserts, the termination charge is not a penalty, but a correction mechanism by which SBC can insure that all its customers are paying the same rate for the same services. Otherwise, the opportunity is present for a carrier to obtain the same service for the same term but pay less, simply by overstating its term commitment up front.  Any carrier, SBC asserts, would have no incentive to give the proper commitment; rather, its incentive would be to enter into the longest term optional payment plan available.

Third, SBC asserts that the Commission's interpretation of the Illinois tariff conflicts with the plain language of the tariff.  For this, SBC notes that the Commission suggested that the "conversion" of an access circuit to an EEL does not constitute a "termination" of access service within the meaning of the tariff because it represents a commitment by a customer to "concomitantly *** purchase *** the same (from a functional standpoint) service under another tariff, using the same systems and facilities of the provider, over no less than the same term applicable to the terminated service."  That stated, SBC argues, the Illinois special access tariff provides that a customer which purchases special access service out of the tariff under a term discount plan (
e.g.
, an optional payment plan) and terminates such service "prior to the expiration of the [optional payment plan] term" will be liable for termination charges.  Put another way, SBC claims, when a CLEC chooses to "convert" a special access service to a combination of UNEs, the CLEC brings to an end, or "terminates," the purchase of that special access service and begins to purchase something else; a combination of unbundled network elements under the terms of either an interconnection agreement or a UNE tariff.

Under the plain language of the Illinois tariff, therefore, SBC concludes that a conversion of service to EELs constitutes a "termination of service."  Moreover, SBC notes, the law is clear that the provision of a UNE does not constitute the provision of "service."  It notes language from the FCC which states that "when interexchange carriers purchase unbundled elements from incumbent LECs, they are not purchasing access ‛services.'  They are purchasing a different product, and that product is the right to exclusive use of an entire element."  
First Report and Order, 
Implementation of the Local Competition Provisions of the Telecommunications Act of 1996
, 11 F.C.C.R. 15499, par.358 (1996).  Consequently, SBC posits, a CLEC's termination of special access services and purchase of unbundled network elements constitutes a termination of special access "service" and the substitution for that "service" of a "different product *** the right to exclusive access or use of entire element[s]."

Fourth, SBC asserts that the ICC's citation to section 13-801 is misplaced.  It notes that when the Commission departs from a prior decision, it must "articulate a reasoned basis for its sudden departure."  
Citizen's Utility Board v. Illinois Commerce Comm'n
, 166 Ill. 2d 111, 132 (1995).  However, SBC argues that the ICC's citation to section 13-801 provided an insufficient basis for concluding that it was time to "move past" its prior decision in 
Level 3
 (upholding the imposition of termination charges).  Section 13-801, SBC notes, does not address the issue of termination charges, much less a change to the law regarding tariffed termination charges to "EEL conversions."  Instead, SBC asserts, the General Assembly went out of its way to make clear that section 13-801 does not constitute a change in Illinois law with respect to special access circuits, stating that "nothing [in section 13-801] is intended to require or prohibit the substitution of switched or special access services by or with a combination of network elements nor address the Illinois Commerce Commission's jurisdiction or authority in this area."  220 ILCS 5/13-801(j) (West 2002).  Accordingly, because the ICC had no reasoned basis for reversing its prior position in 
Level 3
, SBC argues it was improper for the ICC to issue the underlying ruling.

SBC's last argument on this issue is that the Commission's order violates the filed rate doctrine.  For this, SBC notes that the relationship between it and special access customers is defined by tariff, and " ‛[t]he rights as defined by the tariff cannot be varied.' "  
Square D Co. v. Niagara Frontier Tariff Bureau, Inc.
, 476 U.S. 409, 417, 90 L. Ed. 2d 413, 421, 106 S. Ct. 1922, 1927 (1986) quoting 
Keogh v. Chicago & Northwestern Ry. Co.
, 260 U.S. 156, 163, 67 L. Ed. 183, 187, 43 S. Ct. 47, 49 (1922).  As such, under the filed rate doctrine, a customer "can claim no rate as a legal right other than the filed rate."  
Montana-Dakota Utilities Co. v. Northwestern Public Service Co.
, 341 U.S. 246, 251, 95 L. Ed. 912, 919, 71 S. Ct. 692, 695 (1951).  In fact, SBC notes, one of the main purposes of the filed rate doctrine is to prevent discriminatory treatment among similarly situated customers.  
American Telephone & Telegraph Co. v. Central Office Telephone, Inc.
, 524 U.S. 214, 223, 141 L. Ed. 2d 222, 233, 118 S. Ct. 1956, 1963 (1998) (
AT&T Co.
).  Therefore, SBC concludes that the doctrine precludes any claims that would allow a customer to avoid its tariff obligations on any ground, or to effectively receive service at a lower rate than all other similarly situated customers.  "[T]he policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services.  It is that antidiscriminatory policy which lies at ‛the heart of the common-carrier section of the Communications Act.' "  
AT&T Co.
, 524 U.S. at 223, 141 L. Ed. 2d at 233, 118 S. Ct. at 1963, quoting 
MCI Telecommunications Corp. v. American Telephone and Telegraph Co.
, 512 U.S. 218, 229, 129 L. Ed. 2d 182, 192, 114 S. Ct. 2223, 2231 (1994).

Consequently, in going back to SBC's illustration between carriers A and B, because both carriers purchased under the tariff for two years, both carriers should pay the two-year rate.  And so long as carrier A –which committed to a five-year rate– pays a termination charge, it ultimately pays the same rate as carrier B.  Conversely, by precluding such termination charges, carrier A will 
not
 pay the filed rate for the two-year term and, therefore, "similarly situated customers pay different rates for the same services."

Globalcom and the Commission first respond that SBC's citations to prior ICC and FCC orders are misplaced and do not foreclose the Commission's interpretation of SBC's Illinois tariff.  As the FCC held in the 
UNE Remand Order
, the requesting carrier is only required to pay "appropriate" termination penalties.  
UNE Remand Order
, 15 F.C.C.R. 3696.  Here, Globalcom and the Commission allege that where SBC's Illinois tariff does not address conversion of a special access to an EEL, SBC's attempt to assess termination fees was based on the presumption that a business relationship had ceased.  And because a cessation of a business relationship cannot be simply presumed, Globalcom and the Commission argue, the Commission was correct to find such penalties inappropriate.

However, Globalcom and the Commission are unable to dispute the fact that, in the past, the FCC has "rejected comments that early termination penalties are obstacles to [a] CLEC[‛s] ability to convert special access to EELs."  Instead, they attempt to distinguish the cases cited by SBC by claiming that they only stand for the proposition "that it was not clear that the practice of imposing termination penalties was a violation of 
FCC
 rules (as opposed to the state rules, laws, and tariffs at issue in the present case)." (Emphasis original.)  In other words, Globalcom and the Commission argue, none of those cases are specifically on point as to whether such fees are appropriate in a given set of facts – they only say that the FCC would not invalidate a contractual arrangement between the parties.

Moreover, Globalcom and the Commission claim that the ICC's previous decision in the 
Level 3
 order is unpersuasive.  In 
Level 3
, the CLEC claimed, like Globalcom did here, that because the carrier "will continue to make use of the circuit provided as an EEL, there is no ‛termination of service' in the true sense of the word."  
Level 3
, Ill. Com. Comm'n No. 00-0332 (administrative brief).  The Commission concluded:

"The FCC and various state commissions have consistently held that the CLEC should remain responsible for termination fees.  There is no reason at this time to take a fresh look at termination charges.  We agree that if the FCC felt a fresh look was mandated or appropriate, it would have stated so in its 
UNE Remand
."  
Level 3
, Ill. Com. Comm'n No. 00-0332 (August 30, 2000).

In other words, Globalcom and the Commission argue, like the federal cases, the Commission was not answering the question of whether the termination charges were appropriate, but whether it would nullify the contractual arrangement between the parties.  And with regard to the quote in 
Level 3
 in which the Commission stated that other state commissions had upheld termination fees, the Commission in the present case notes that statement is no longer true.  See 
In re Petition of AT&T Communications of the South Central States, Inc.
, Ky. Pub. Serv. Com. No. 2000-465 (June 22, 2001); 
In re Arbitration of the Interconnection Agreement Between AT&T Communications of the South Central States, Inc.
, Tenn. Reg. Util. Com.No. 00-00079 (November 29, 2001).

While it is true that none of the cases to which SBC cites specifically ruled on the appropriateness of early termination fees, 
i.e.
, whether a fee constitutes an appropriate amount, the fact remains that the Commission in the present case was not called upon to determine the reasonableness of SBC's fees.  Rather, Globalcom prayed for a finding that the fees –regardless of the amount– constitute anticompetitive obstacles intended by SBC to slow the conversion from special access to EEL access.  Quite simply, FCC case law and the ICC's decision in 
Level 3
 hold contrary to that position.  And because even the Commission's order finds the FCC cases to be persuasive authority, we find that the Commission's decision on this issue is misguided.

With regard to the nature and purpose of the termination charge, it is evident that the Commission concluded that such charges should not apply when the terminating carrier purchases an EEL because of its finding that "[t]he continuing revenue stream also insulates the provider against additional economic loss."  To that end, we agree with SBC that the Commission was incorrect in assuming that the termination charges were essentially for lost revenue 
after
 the termination date.  Rather, as put by SBC, we find the termination charges "true-up" the revenue received before the termination date to correct for the fact that those revenues reflected a discount to which the customer, by virtue of its early termination, was not entitled.  Unlike the Commission, we do not think that these fees discourage the purchase of EELs, as a termination charge only affects the price paid for access service, regardless of whether a CLEC decides to purchase an EEL.  This finding is in accordance with FCC's determination that the assessment of termination charges does not inhibit access to UNEs or to competition.  See 
Joint Application by BellSouth Corp.
, 17 F.C.C.R. 9018, par. 200 (2002) ("[w]e reject comments by US LEC/XO that *** early termination penalties *** are obstacles to their ability to convert special access circuits to EELs").

Moreover, we disagree with the ICC's determination that the transfer of special access services to the purchase of an EEL does not constitute a "termination" of those special access services.  While SBC's Illinois tariff does not define "termination of service," we simply do not think that the purchase of an EEL equates the continuation of special access service.  That the Commission determined "[t]here is no dispute that EELs and special access are functionally identical" is irrelevant to whether SBC is continuing to lease a special access service under the tariffed rate.  As SBC asserts, a CLEC that ends its special access services and purchases an EEL actually 
stops
 
paying
 
the
 
tariffed
 
rate
 for special access services and begins purchasing something else at a different price under a separate contract.
  In that regard, it is only logical that the "termination of service" clause in the Illinois tariff refers only to the services provided under that tariff and does not refer to the termination of all services in general or to the termination of some other service not mentioned in the tariff.

This determination coincides with the FCC's finding that supplying a UNE or a combination of UNEs does not constitute the provision of a service.  See 
First Report and Order, 
Implementation of the Local Competition Provisions of the Telecommunications Act of 1996
, 11 F.C.C.R. 15499, par. 358 (1996) ("when interexchange carriers purchase unbundled elements from incumbent LECs, they are not purchasing access ‛services.'  They are purchasing a different product, and that product is the right to exclusive use of an entire element").  While the FCC's decision is persuasive authority in itself, as SBC points out, Illinois law also defines "network elements" not as a "service," but as a "facility or equipment used in the provision of a telecommunications service."  220 ILCS 5/13-216 (West 2002).  Accordingly, we find that a termination of the tariffed service is, by definition, a "termination of service" for purposes of the tariff.

Because we agree with SBC's first three arguments regarding termination penalties, we need not decide whether the ICC's citation to section 13-801 is misplaced or whether it violated the filed rate doctrine.  Indeed, because we find no evidence: that SBC knowingly sought to impede competition or acted unreasonably in maintaining or defending its position, as Act section 13-514 requires; that early termination penalties are obstacles to a CLEC's ability to convert special access to EELs; or that the transfer of special access services to the purchase of an EEL does not constitute a "termination" of those special access services, we reverse the ICC's decision on this issue.

SBC's next argument on appeal is that the Commission erred in ruling that SBC's collocation requirement for new EELs was a knowing and unreasonable measure intended to prevent CLECs from purchasing new EELs.  Again, for this argument, SBC first points to section 13-514 of the Act, which states in pertinent part that "[a] telecommunications carrier shall not knowingly impede the development of competition in any telecommunications service market."  220 ILCS 5/13-514 (West 2002).  SBC argues that once its conduct and intentions are placed in the proper context, it becomes impossible for any court to find it in violation of Act section 13-514.

As even SBC admits, Act section 13-801, enacted on June 30, 2001, obligated SBC under state law to provide new EELs to requesting CLECs.  Specifically, section 13-801 provided that SBC had a duty to "combine any sequence of unbundled network elements that it ordinarily combines for itself."  220 ILCS 5/13-801(d)(3) (West 2002).  On its face, therefore, section 13-801 imposed a broad duty upon SBC without any restrictions other than the requirement that the UNE combination be one that SBC ordinarily provides for itself.

In that regard, however, SBC notes that it filed a tariff to implement section 13-801(d)(3)'s requirement, and that instead of letting the tariff take effect as SBC requested, the ICC suspended that tariff –the permanent tariff– for investigation.  In the meantime, in the attempt to satisfy various CLECs' requests to begin the purchase of new EEL combinations, SBC filed its interim tariff, the purpose of which, SBC asserts, was to address requests by CLECs and the ICC staff to "immediately begin accepting and filing CLEC orders for the [Draft] I2A Combinations" pending the outcome of the permanent tariff investigation.  Put another way, SBC argues that because it voluntarily filed a tariff that gave Globalcom 
more
 access to its network than to what it was entitled at that time, its conduct was actually promoting the development of competition in Illinois.  And where section 13-514 seeks to punish conduct that is unreasonable and knowingly anticompetitive, SBC concludes that it cannot possibly be liable under that section.

Second, SBC argues that the ICC misinterpreted and misapplied the "knowingly" requirement of section 13-514.  In its underlying order, the ICC found that "in view of applicable law and administrative rules," it "should have been apparent to SBC in September, 2001, when it filed the interim tariff, that the applicable authorities were not merely devoid of a collocation requirement [for new EELs], but expressly negated it."  However, SBC notes that at the time the interim tariff was filed, federal law arguably 
supported
 a collocation requirement and state law arguably 
required
 it.  At a minimum, SBC claims, there was no prohibition on such a requirement and it was not unreasonable to think that such a requirement could be permitted.

With regard to federal law, SBC first addresses the Commission's reliance on the FCC's 
UNE Remand Order
 which, SBC asserts, actually supports SBC's position.  SBC claims that the 
UNE Remand Order
 makes clear that, under then-controlling law, incumbent carriers had no obligation to create new EELs whatsoever.  See 
UNE Remand Order
, pars. 478 through 481.  Consequently, SBC contends, if there was no duty to combine new EELs at the time the 
UNE Remand Order
 was issued, there certainly were no "express" rules on what requirements could be imposed if an incumbent voluntarily chose to provide those EELs.  Moreover, SBC argues that the FCC explained that, in the one situation where an incumbent might voluntarily choose to create new EELs, which it could do to avoid other unbundling requirements, the purpose of creating those EELs would be to allow a CLEC to "increase [its] efficiencies" by aggregating unbundled loops at central offices where the CLEC "is already collocated."  
UNE Remand Order
, par. 288.   

SBC claims that in rendering its decision, the ICC ignored those two excerpts from the 
UNE Remand Order
, and instead relied upon footnote 973 of that decision, which states:

"We note that we held previously ***
 that incumbent LEC's 
may not limit a competitor's ability to access network elements in order to combine them to collocation arrangements
.  Specifically, we stated that ‛Bell South's offering in Louisiana of collocation as the sole method for combining unbundled network elements is 
inconsistent with section 251(c)(3)
 [of the Federal Communications Act.  47 U.S.C. § 251(c)(3) (West 1996))].' [Citation.]  This decision was based on our rule that requesting carriers are entitled to request any ‛technically feasible' methods of accessing and combining unbundled network elements.  We found that 251(c)(3) required incumbent LECs to provide ‛nondiscriminatory access to network elements on an unbundled basis at any technically feasible point . . . ,' 
which was not limited to collocation arrangements
. [Citation.]" (Emphasis added.)  
UNE Remand Order
, par. 482, n.973. 

However, SBC claims that footnote 973 is inapposite to the case at bar because it dealt with whether an incumbent can require collocation as the sole method by which a CLEC combines UNE's for itself–something entirely irrelevant to whether UNEs combined by an incumbent could be required to terminate in a CLEC's collocation arrangement.  Accordingly, SBC concludes that nothing in the 
UNE Remand Order
 supports the Commission's finding that SBC acted unreasonably or was knowingly anticompetitive in including the collocation requirement.

SBC also takes issue with the ICC's reliance upon 
Supplemental Order Clarification, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996
, 15 F.C.C.R. 9587 (2000), 
aff'd
, 
Competitive Telecommunications Ass'n v. Federal Communications Comm'n
, 309 F.3d 8 (D.C. Cir. 2002).  In that decision, the FCC specified the conditions under which an incumbent would have to "convert" existing special access circuits to EELs.  The FCC established three "safe harbors" upon which a CLEC could rely to prove that it met the requirements for such a conversion.  
Supplemental Order
, par. 22.  Two of those safe harbors require the preexisting EEL to terminate in the CLEC's collocation space, and one other does not.  
Supplemental Order
, par. 22.  The ICC viewed the third option as "preclud[ing] the conclusion that an EEL necessarily involves collocation" and as "dispell[ing] the notion that the sole purpose" of an EEL is to lower the CLEC's costs of collocation.

SBC argues that such an analysis is flawed for two reasons.  First, SBC notes that the 
Supplemental Order
 never "expressly negated" any kind of requirement with respect to new EELs.  Second, SBC claims that the ICC's conclusion ignores the differentiation between a preexisting EEL and a newly created EEL.  Particularly, SBC notes that the only purpose of a special access to EEL conversion is arbitrage, as the CLEC can obtain the same functionality as a special access circuit at a much lower price.  However, the purpose of purchasing a new EEL is different, in that the CLEC not only avoids paying the costs of a special access circuit, but also can significantly reduce its overall costs by aggregating its new EELs at a single central office.  See 
UNE Remand Order
, par. 288.  In light of that difference, SBC argues that the ICC's conclusion that the 
Supplemental Order
 somehow "expressly negated" a collocation requirement for new EELs has no foundation.

With regard to state law, SBC asserts that Act section 13-801 also supports SBC's position.  Specifically, Act section 13-801 requires SBC to offer CLEC all of the UNE combinations addressed in the Draft I2A.  In pertinent part, section 13-801(d)(3) states that SBC

"[S]hall combine [for CLECs] any sequence of unbundled network elements that it ordinarily combines for itself, including but not limited to, unbundled network elements identified in The Draft of the Proposed Ameritech Illinois 271 Amendment (I2A) found in Schedule SJA-4 attached to Exhibit 3.1 filed by Illinois Bell Telephone Company on or about March 28, 2001 with the Illinois Commerce Commission under Illinois Commerce Commission Docket Number 00-0700."  220 ILCS 5/13-801(d)(3) (West 2002).

To comply with that requirement, SBC translated the Draft I2A's provisions on new UNE combinations, including the collocation requirement, for new EELs into the interim tariff and permanent tariff.

Thus, SBC asserts, its implementation of section 13-801(d)(3)'s Draft I2A requirement cannot, under any rational view, be deemed unreasonable or knowingly designed to impede competition.  Nevertheless, the ICC stated that it found "no basis for [SBC's] presumption that the Legislature imported the collocation requirement of Amendment I2A into Section 13-801."  Rather, the ICC held that SBC "should have known" that the statutory reference to the Draft I2A "merely served to identify, without having to list at length, the minimum group of [UNE Combinations] that [SBC] would have to make available."  In short, SBC argues that the ICC concluded that SBC should have known that the legislature's identification of Draft I2A only included the types of UNE combination in the Draft I2A, not their definitions or attendant terms and conditions.

However, SBC argues that from its own perspective, the legislature was directing it to incorporate the whole Draft I2A document, not just its gist.  To that end, SBC argues that the ICC's decision cannot possibly be sustained on the grounds that SBC's reading of Act section 13-801 was incorrect, much less that it was unreasonable.  For even if Act section 13-801(d)(3) could not be conceivably read as requiring or authorizing SBC to incorporate the terms and conditions of Draft I2A into the tariff, "that would still leave the ICC bereft of any evidence to support its conclusion that the law affirmatively ‛negate[d]' a collocation requirement for new EELs."

Given that nothing in the law actually "negate[d]" a collocation requirement for new EELs, SBC notes that the ICC then resorted to claiming that because SBC "should have known" a collocation requirement was unlawful because the "applicable authorities were *** devoid of a collocation requirement."  However, SBC claims that such a theory turns the law on its head, where section 13-514 requires a plaintiff to prove that the defendant's conduct was, in light of all the surrounding circumstances, knowingly anticompetitive and objectively unreasonable.  See 
21st Century Telecom of Illinois, Inc
, Ill. Com. Comm'n No. 00-0219 (June 15, 2000).  Moreover, the burden is not on the defendant to prove that each of its actions had express prior authorization, as no Illinois case has ever held that utilities need to prove express prior authorization for every tariff provision.  See 
Lowden v. Illinois Commerce Comm'n
, 376 Ill. 225, 231 (1941).

SBC also argues that the ICC's own conduct defeats its claims that the law was clear as of September of 2001.  For if the law was as clear as the ICC said it was, the ICC presumably would have suspended the interim tariff and not allowed it to take effect.  See 
Illinois Bell Telephone Co. v. Illinois Commerce Comm'n
, 306 Ill. 109, 111 (1922) (the ICC alone "is charged with the duty of establishing just, reasonable and uniform" terms of service).  In fact, SBC notes, after two months of review, the ICC suspended the permanent tariff because of concerns about the legality of its terms, and the interim tariff contained the same terms for EELs as the permanent tariff.  Consequently, SBC asserts, the fact that the ICC chose not to suspend the interim tariff means that one of two things must be true: Either the law was 
not
 so clear as of September 2001 as the ICC found it to have been, or the ICC decided that the procompetitive benefits of the interim tariff outweighed any potential legal concerns about isolated terms and conditions.  Either way, SBC claims, the ICC had no basis in Illinois law to find that SBC's conduct was anticompetitive.

Finally, SBC argues that the Commission's award of damages violated the filed rate doctrine.  In short, the filed rate doctrine essentially bars all claims for damages that rest on allegations that rates, terms, and conditions in a filed tariff are too high or otherwise unreasonable.  See 
American Telephone & Telegraph Co. v. Central Office Telephone, Inc.
, 524 U.S. 214, 222-23, 141 L. Ed. 2d. 222. 233, 118 S. Ct. 1956, 1963 (1998).  SBC notes that the filed rate doctrine basically codifies the rule that once a tariff becomes effective, it completely governs the legal relationship between the utility and its customer.  In other words, the utility cannot provide and the customer has no rights to receive service on rates, terms or conditions different from those in the effective tariff.  See 
Keogh v. Chicago & Northwestern Ry. Co.
, 260 U.S. 156, 163, 67 L. Ed. 183, 188, 43 S. Ct. 47, 50 (1922); 
Cahnmann v. Sprint Corp
, 133 F.3d 484, 487 (7th Cir. 1998).  Consequently, the filed rate doctrine prevents any claim for damages based on the difference between what a customer actually paid under an effective tariff and what the customer alleges it "should have" paid barring the utility's alleged misconduct.  
Cahnmann
, 133 F.3d at 488-90 (doctrine bars any claim for damages "when the effect of the suit would be to challenge a tariff").  Illinois, SBC notes, incorporates the filed rate doctrine through Act sections 9-240 and 9-243.  220 ILCS 5/9-240, 243 (West 2002).  

After weighing these arguments very carefully, we have determined that the ICC was correct in finding SBC's collocation requirement improperly exceeded the conduct prescribed by the legislature in Act section 13-801 for the provision of new EELs.  We do not dispute that SBC gave Globalcom more access to UNEs than that to which Globalcom legally was entitled.  Indeed, by voluntarily filing the interim tariff, SBC provided a means for CLECs to obtain new EELs while the permanent tariff was under review.  However, not only was the interim tariff of no real economic use to Globalcom, it also frustrated Globalcom's proposed way of competing against SBC and the other CLECs in SBC's service territory, in direct violation of Act section 13-801.  And in light of the fact that both the interim tariff and the initial draft of the permanent tariff included the collocation requirement, there can be little doubt that SBC acted knowingly in disregarding that section.

Regarding SBC's argument that the Commission erred in finding that federal law "expressly negated" a collocation requirement, we first note that the Commission never, in fact, held that federal law had such an impact.  Rather, as noted by the Commission, the Commission's Order on Rehearing cited the decisions from the Eighth Circuit Court of Appeals to demonstrate that SBC could not have acted in bad faith by failing to combine UNEs such as EELs before FCC Rule 315 was fully reinstated by the Supreme Court.
(footnote: 1)  47 C.F.R. §51.315 (1996)) (codifying the conclusions of the 
First Report and Order
 in administrative rules promulgated in August 1996).

Moreover, even if we were to analyze the other federal law that was before SBC at the time it filed its interim tariff, we still find no indications that federal law allowed an incumbent to compel a CLEC's compliance with a collocation requirement as a prerequisite for obtaining a new EEL.  In fact, we find the 
UNE Remand Order
 demonstrates that federal law prohibited compulsory collocation requirements while allowing collocation requirements in some instances.  While SBC contends that other language of the 
UNE Remand Order
 suggests that there were no "express" rules on what requirements could be imposed if an incumbent voluntarily chose to provide EELs to its competitors, we think that language merely describes a situation where a CLEC already has equipment collocated at an incumbent's central office and seeks an EEL to "increase [its] efficiencies."  Indeed, we think footnote 973 
of the 
UNE Remand Order
 cogently, if not expressly, prohibits an incumbent from requiring CLECs to collocate as a condition 
precedent
 to obtaining an EEL. 

In so finding, we reject SBC's contention that the Commission's citation to footnote 973 of the 
UNE Remand Order
 is out of place because it concerned whether an incumbent can require collocation as the sole method by which a CLEC combines UNEs for itself, not whether UNEs combined by an incumbent could be required to terminate in a CLEC's collocation arrangement.  The difference between those two situations is in semantics only.  As the FCC noted, its "decision was based on [its] rule that requesting carriers are entitled to request any ‛technically feasible' methods of accessing and combining unbundled network elements. *** [It] found that section 251(c)(3) required incumbent LECs to provide ‛nondiscriminatory access to network elements on an unbundled basis at any technically feasible point . . . ,' 
which was not limited to collocation
 
arrangements
. [Citation.]" (Emphasis added.)  
UNE Remand Order
, par.482, n.973.  In other words, where the end result of an incumbent's policy is to require a CLEC to collocate with the incumbent as a condition precedent to obtaining a new EEL, such a policy is in violation of federal law where requesting carriers may request any "technically feasible" methods of accessing and combining UNEs, not limited to collocation arrangements.  Because SBC acted in spite of this admonishment, we think this is a clear indication that it was knowingly anticompetitive in including the collocation requirement.

As to SBC's argument regarding the ICC's reliance upon its 
Supplemental Order
, we also look to the three "safe harbors" under which a CLEC such as Globalcom could rely to prove it met the requirements for an EEL conversion.  As the ICC noted, one of those safe harbors does not require collocation:

"The requesting carrier certifies that at least 50 percent of the activated channels on a circuit are used to provide originating and terminating local dialtone service and at least 50 percent of the traffic on each of these local dialtone channels is local voice traffic, and that the entire loop facility has at least 33 percent local voice traffic.  When a loop- transport combination includes multiplexing *** each of the individual *** circuits must meet this criteria.  This option does not allow loop-transport combinations to be connected to the incumbent LEC's tariffed services. Under this option, collocation is not required."

We agree with the Commission that the third safe harbor option "precludes the conclusion that an EEL necessarily involves collocation."  This third option, we think, was intended to refute the very argument SBC is making: that the FCC defined EELs as being part of a collocation arrangement.  In so finding, we view the fact that the Commission referenced FCC orders which involve conversion, as opposed to the issuance of new EELs, to be irrelevant where it appears the Commission was only attempting to disprove the notion that the definition of EELs necessarily included a collocation requirement.

In that regard, we find SBC's attempt to differentiate a preexisting EEL and a newly created EEL to be ill-founded.  As the Commission noted, the issue is not whether collocation can be a reasonable requirement under some circumstances, but whether access to EELs can be 
limited
 to collocation arrangements.  The problem with SBC's tariff in this case was that it included a collocation requirement for all new EELs that was based upon SBC's view that the 
UNE Remand Order
 defined EELs as ending in collocation arrangements.  However, in light of more explicit language of the 
UNE Remand Order
 ("incumbent LECs may not limit a competitor's ability to access network elements in order to combine them to collocation requirements" (
UNE Remand Order
, par. 482 n.973) as well as the FCC's establishment of an alternative to collocation arrangement in the 
Supplemental Order Clarification
, we conclude that a blanket collocation requirement for new EELs, like the one in the interim compliance tariff, is not supported by the federal authorities cited by SBC.

Regarding state law, namely Act section 13-801, we first observe that SBC has not provided any reason for compelling its competitors to collocate in an SBC central facility, regardless of its competitors' wishes.  Because Act section 13-801 states that LECs are to provide, 
inter alia
, the unbundled network elements they ordinarily combine for themselves 
at 
any
 technically feasible point, including 
but
 
not
 
limited
 
to
 unbundled network elements identified in the Draft I2A, we find that SBC has provided no evidence that the I2A Draft combinations it was to provide required EELs terminating in a collocation arrangement at a SBC central facility. 

As the Commission stated:

"Subsection 13-801(d) establishes the broad duty to combine ‛any sequence of [UNEs] that it ordinarily combines for itself,' and to do so ‛
as requested, and any technical feasible point
 on just, reasonable, and nondiscriminatory rates, terms and conditions. (Emphasis added.)  Given the breadth and clarity of that statutory directive (as well as the admonition in subsection 13-801(a), quoted above, to provide UNEs ‛to the maximum extent possible'), [SBC] should have viewed limitations on the provision of UNEs, such as collocation, as exceptions requiring express authority.  In this instance, such authority did not exist."

In other words, SBC was to provide network elements "as requested" by Globalcom and other carriers.  And by tacking on a technically unnecessary collocation requirement to the tariff, SBC's tariff fails, on its face, to provide network elements "as requested."

Moreover, SBC's reliance upon the legislature's mention of the Draft I2A is overbroad in that SBC attempts to construe all the attendant circumstances of that draft as necessary
 elements of its tariff / EEL offering.  However, the plain language of the statute does not support such a ruling where Act section 13-801(d)(3) clearly provides that the duty to provide the combined UNEs includes 
but
 
is
 
not
 
limited
 
to
 Draft I2A UNEs.  In fact, the Commission concluded in its order on rehearing that since both it and the FCC define an EEL as a combination of loop, dedicated transport, and other elements –regardless of where those elements are collocated– it was unreasonable for SBC to assume that the legislature intended, without expressly stating, that it was adopting a limited and technically unnecessary definition of and EEL.  Put another way, because the legislature's reference to Draft I2A merely served to identify the minimum group of UNEs that SBC would have to make under section 13-801, it is impossible to read a collocation requirement as a 
necessary
 component of a tariff.

As to whether the Commission's delay in suspending the interim tariff while actively suspending the permanent tariff somehow indicates that the requirements of Act section13-801 were less than clear, we note that the Commission's decision whether to suspend a proposed utility rate and to hold a hearing is discretionary, and need not be based upon a finding that the proposed rate is reasonable.  
City of Galesburg v. Illinois Commerce Comm'n
, 47 Ill. App. 3d 499 (1977).  Thus, the Commission's suspension of the permanent tariff while allowing the interim tariff to go into effect is meaningless other than that there was good cause shown for the Commission to allow the interim tariff as a whole to be allowed to go into effect.  In short, the Commission did not address, much less determine, the reasonableness of the underlying purpose of the collocation requirement in the interim compliance tariff.  As we recently noted, "[w]ith a pass-to-file tariff, the [Commission] does not establish rates, exercise control over the rates, or go beyond fact gathering; instead, it merely allows the rates to go into effect. *** [T]he Act does not require the [Commission] to review the rates before they become effective."  
A. Finkl & Sons Co. v. Illinois Commerce Comm'n
, 325 Ill. App. 3d 142, 150 (2001).

Finally, we disagree with SBC's argument that the filed rate doctrine should operate to bar the ICC's order.  In 
Keogh v. Chicago & Northwestern Ry. Co.
, 260 U.S. 156, 163, 67 L. Ed. 183, 188, 43 S. Ct. 47, 50 (1922), the United States Supreme Court held that a private plaintiff could not claim damages under antitrust laws where the allegedly excessive shipping rates at issue had been filed with the Interstate Commerce Commission.  In its reasoning, the Court examined the regulatory framework of the Interstate Commerce Act and noted that the regulation only allowed the recovery of damages for illegal rates for actions brought to the Interstate Commerce Commission.  However, the Court concluded that Congress could not have intended that there be an additional recovery for damages incurred from antitrust violations.  
Keogh
, 260 U.S. at 162, 67 L. Ed. at 187, 43 S. Ct. at 49. Recovery was barred because the shipper's damages were hypothetical since "no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him.  The benefit might have gone to his customers, or conceivably, to the ultimate consumer."  
Keogh
, 260 U.S. at 165, 67 L. Ed. at 189, 43 S. Ct. at 50.  Moreover, SBC fails to recite all the pertinent language chief Justice Rehnquist used in his concurring opinion in 
AT&T Co.
:

"The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff.  It does not serve as a shield against all actions based in state law."  
AT&T Co.
, 524 U.S. 214, 230-31, 141 L. Ed. 2d 222, 238, 118 S. Ct. 1956, 1966-67 (1998) (Rehnquist, C.J., concurring).

Here, we find the filed rate doctrine, however, does not apply to bar Globalcom's claim where Globalcom is not challenging whether SBC adhered to a filed tariff.  Rather, Globalcom is claiming that SBC's conduct was anticompetitive in violation of section 13-514 of the Act. While it is true that the reasonableness of SBC's rates and the fact that those rates were governed by the ICC may be factors in deciding this issue, they are not dispositive. As the Commission stated, Globalcom is simply not requesting enforcement of terms or conditions that depart from the tariff or punishment for SBC's conduct in any transaction.  Rather, Globalcom's claim is that the tariff was designed to, and did, impede competition.  Accordingly, the filed rate doctrine does not apply.

In its counterclaim, Globalcom asserts: (1) that it is entitled to 100% of attorney fees; (2) that it is entitled to damages from orders it placed on both intrastate and interstate tariffs; and (3) that the Commission erred in ordering Globalcom to pay one-half of the Commission's costs.  Since we are affirming the ICC on one issue raised by SBC and reversing on another, however, the issues of attorney fees and costs need to be remanded so that the ICC can, in its discretion, recalculate the appropriate amounts for each.  In so remanding, we note that it is well established that fee-shifting statutes are to be strictly construed and that the amount of fees to be awarded lies within the Commission's "broad discretionary powers" (
U.S. Fidelity & Guaranty Co. v. Old Orchard Plaza Limited Partnership
, 333 Ill. App. 3d 727, 740 (2002)) and that the general rule is that a party is not entitled to fees for its unsuccessful claims (
Becovic v. City of Chicago
, 296 Ill. App. 3d 236, 242 (1998). 

We also note that with regard to the Commission's assignment of its costs, Act section 13-515(g) expressly directs the Commission to "assess the parties" for "all of the Commission's costs of investigation and conduct of the proceedings."  220 ILCS 5/13-515(g) (West 2002).  The Commission is to "divid[e] the costs according to the resolution of the complaint."  220 ILCS 5/13-515(g) (West 2002).  In light of the fact that Globalcom has proven to be unsuccessful on its termination charges claim, we leave it to the discretion of the Commission to provide an accurate reallocation of the Commission's costs, in accordance with Act section 13-515(g).

Finally, with regard to Globalcom's demand to be compensated for damages incurred from orders it placed on both intrastate and interstate tariffs, we note that the Commission has no authority to order such a refund, as SBC's federal special access tariffs fall within the exclusive jurisdiction of the FCC.  As noted by SBC, Congress granted the FCC exclusive jurisdiction over "
all
 interstate and foreign communication by wire or radio." (Emphasis added.)  47 U.S.C. §152(a) (2000).  Thereafter, Congress developed a comprehensive statutory scheme for exclusive FCC oversight of the filing and enforcement of tariffs and prices for such interstate services.  See 47 U.S.C. §§ 201 through 208 (2000).  State commissions, therefore, have no authority to regulate prices for interstate telecommunications services.  See 
National Ass'n of Regulatory Utility Commissioners v. Federal Communication Comm'n
, 746 F.2d 1492, 1498 (D.C. Cir. 1984) ("[i]nterstate communications are totally entrusted to the FCC"); 
Ivy Broadcasting Co. v. AT&T Co.
, 391 F.2d 486, 491 (2d Cir. 1968) ("questions concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law and *** the states are precluded from acting in this area"); 
Illinois Telephone Corp. v. Illinois Commerce Comm'n
, 260 Ill. App. 3d 919, 922-23 (1994) (holding that the ICC "has no authority to resolve disputes over international tariffs" in light of the FCC's "exclusive authority to regulate interstate and international communication" and its "plenary jurisdiction over charges for such communications").

In addition, while the ICC has never specified the 
amount
 of damages owed to Globalcom based upon SBC's conduct, we also direct the ICC to deduct any damages based upon SBC's early termination fees.  Because we have determined that those early termination fees were never unlawful in the first place, as they were not a violation of Act section 13-514, Globalcom may not recover any monetary amount based upon that claim.

For the foregoing reasons, we reverse the ICC's determination that SBC's imposition of early termination fees constituted anticompetitive conduct, but affirm its determination that the collocation requirements violated Act section 13-514.  Accordingly, we remand the case to the ICC for it to recalculate its award of costs, attorney fees and damages.

Reversed in part and affirmed in part; cause remanded.

QUINN, P.J., and HARTMAN, J., concur.

FOOTNOTES
1:  This was due to the fact that the Eighth Circuit's decisions in 
Iowa Utilities Board v. Federal Commerce Comm'n
, 120 F.3d 753 (8th Cir. 1997) (Iowa I) and 
Iowa Utilities Board v. Federal Commerce Comm'n
, 219 F.3d 744 (8th Cir. 2000) (Iowa III), which invalidated much of FCC Rule 315 were reversed by the United States Supreme Court in 
AT&T Corp. v. Iowa Utilities Board
, 525 U.S. 366, 142 L. Ed. 2d 834, 119 S. Ct. 721 (1999), and 
Verizon Communications, Inc. v. Federal Communications Comm'n
, 525 U.S. __, 152 L. Ed. 2d 701, 122 S. Ct. 1646 (2002).  Thus, 
SBC
 could not be held accountable for failing to act at a time when the fate of the law was greatly uncertain.